IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-376

Filed 3 September 2025

Mecklenburg County, Nos. 17CRS 202152-590, 17CRS202154-590

STATE OF NORTH CAROLINA

v.

SHALOME SCOTT, Defendant.

Appeal by defendant from judgment entered 2 June 2023 by Judge Matt Osman in Superior Court, Mecklenburg County. Heard in the Court of Appeals 13 February 2025.

*Attorney General Jeff Jackson, by Assistant Attorney General Benjamin Szany, for the State.*

*Anne Bleyman for defendant-appellant.*

STROUD, Judge.

Defendant Shalome Scott appeals from a judgment entered upon a jury's verdict finding him guilty of first-degree murder and possession of a firearm by a felon. On appeal, Defendant argues that the trial court abused its discretion by denying his motion for a continuance and that his conviction for possession of a firearm by a felon is unconstitutional. After careful review, we conclude that Defendant received a fair trial, free from prejudicial error.

## I. Factual Background and Procedural History

On 12 January 2017, Charlotte-Mecklenburg Police ("CMPD") responded to a

911 call about a gunshot victim at a barber shop in a strip mall. The victim was pronounced dead at the scene and officers found about $300 in cash near his body. At trial, the evidence showed that the victim was Massaquoi Kotay, a father of four from Liberia, who had opened a convenience store next to the barber shop just six months earlier. The State's evidence showed that—after rushing into the barber shop and asking for help—the victim died from gunshot wounds to his chest and abdomen.

Defendant testified that on the date of the offense, he was attacked by three individuals while they were "discussing drugs" and he fled from his vehicle, with a gun, into the woods to escape his assailants. In the process of fleeing from his unknown assailants, Defendant encountered *another* person, and despite his degenerative eye condition[1] and fear for his life from the three unknown assailants, Defendant followed that person to the convenience store owned by the victim because Defendant wanted to buy cigarettes.

Defendant testified that he was "scared" because of the ambush he had just narrowly escaped, and because of his degenerative eye condition, he could not identify an unknown third person in the store based on the person's voice. According to Defendant, he assumed that the unknown person, whom he claimed he could not see due to his eye condition, was one of the unknown assailants Defendant had just escaped. Fearing for his life, Defendant shot and killed the unknown person he could

---

[1] As will be discussed at great length below, Defendant suffers from a degenerative eye condition known as keratoconus.

not see.  That unknown person was the victim.

Security footage from a nearby business showed two men, one wearing a black hoodie, and the other wearing a red sweatshirt, approaching the convenience store on the date of the offense; Defendant admitted at trial that he was the man in the black hoodie.  A few minutes later, the security footage showed Defendant and the other individual running away from the strip mall, with the other individual holding what appeared to be a four-or-six pack ring, used to hold four or six beers, with *one* can remaining in it.  CMPD law enforcement officers located an unopened beer can, still cold to touch, outside of the convenience store when police responded to the 911 call.

The State presented eyewitness testimony from an employee of a tire store near the strip mall where the shooting occurred.  The tire store employee testified that he heard multiple gunshots and saw two figures running away from the strip mall, toward a nearby residence.[2]  The tire store employee testified that, during the weekend after the shooting, he was at the residence—the same residence he had seen the individuals running toward after the shooting—when Defendant, whom the tire store employee knew as "Castro"[3] told him *he* had shot the victim in the convenience

---

[2] There is a discrepancy in the record as to the spelling of the address at the center of CMPD's investigation into the shooting. In some instances, it is spelled "Aaron Taylor Lane," in others, "Erin Taylor Lane."  For purposes of this opinion, we refer to the location as "the residence."

[3] Data extracted from Defendant's cell phone using Cellebrite technology established that the phone's owner was "Castro Cartega."  The State also presented evidence that, in a jail phone call, Defendant

store.

The following Monday, 16 January 2017, the tire store employee contacted a law enforcement officer with CMPD and asked to speak to a detective. He informed law enforcement about the nearby residence, Defendant's identity, and the alleged culprit responsible for the shooting. At trial, Defendant admitted that he had met the tire store employee previously and had been at the residence *after* the shooting occurred.

The State also presented evidence extracted from Defendant's cell phone using Cellebrite. Notably, on the date of the murder, Defendant downloaded a file onto his phone named "homicide investigating standard operating procedures 1999.pdf." In the days following the shooting, Defendant searched for "CMPD warrant inquiry," "update on north charlotte business owner killed," "evidence to prove murder[,]" and news articles about business owners who had been killed. Defendant also searched for his own name on the CMPD warrant webpage.

On 23 January 2017, Defendant was indicted upon a true bill of indictment by a Mecklenburg County Grand Jury for robbery with a firearm, possession of a firearm by a felon, and first-degree murder. The trial was calendared to begin on 15 May

---

identified himself as "Castro." The eyewitness had previously identified Defendant as the individual he knew as "Castro" in a witness lineup, and at trial, the eyewitness identified Defendant as the individual who had introduced himself to the eyewitness as "Castro." Defendant presents no argument that he *is not* Castro, therefore, the evidence indicates Defendant, Shalome Scott, used the alias "Castro."

2023, when, on 5 May 2023, Defendant filed a motion to continue trial because Defendant suffered from keratoconus, a degenerative condition affecting his eyesight. In the motion, Defendant asserted that he "was 21 years old at the time of these offenses and he had keratoconus, a severe eye condition[,]" where "the cornea which is the clear, dome shaped front of the eye[,] gets thinner and gradually bulges outward into a cone shape. A cone shaped cornea causes blurred vision."

On 9 May 2023, Judge McKnight held a preliminary hearing on Defendant's motion to continue. Although Judge McKnight was not scheduled to be the trial judge for the case and he deferred the ruling on the motion to the trial judge, he entered an order including findings of fact regarding the procedural history of the case and Defendant's motion to continue. This order also included these findings:

> That on or about [17 May] 2021, [D]efendant previously appeared before Superior Court Judge Lou Trosch where the issue of his eyesight was first raised and [D]efendant at that time refused surgical repair. [D]efendant was advised by the [c]ourt at that time, that based on his decision not to receive surgery to repair his eye condition this would not later be a basis for continuance.

> Defense counsel has advised that based on medical advancements in the surgical procedure [D]efendant now seeks surgical repair.

Judge McKnight's order also made a "recommendation" that a "pretrial evidentiary 'accommodations' hearing be conducted to determine" the extent of the impairment of Defendant's eyesight; whether he would be able to participate in the trial "with reasonable accommodations"; and what accommodations may be

necessary.  Judge McKnight's order also stated that

> Defense counsel should be prepared to present evidence concerning [D]efendant's current visual condition and/or restrictions via any of the following nonexclusive means; optometrist or ophthalmologist medical reports/diagnosis, treatment recommendations, observations, in-camera or in-court testimony of the defendant, direct medical testimony or any other witness or evidence relative to his alleged sight impairment.

This information was "to be provided to the trial judge to assist the [c]ourt in making a determination if an impairment exists, the nature and extent of an impairment, and what if any, reasonably accommodations can be made to allow the defendant to participate in his defense."  However, the order noted that the trial judge "is not bound" by the recommendations and the decision on the motion to continue would be in the trial court's discretion.

At the start of the trial, the trial court heard Defendant's motion to continue. Defendant presented as evidence a report from Dr. Kenneth C. Mathys, Ophthalmologist, who saw Defendant on 10 May 2023.  This report states a "primary diagnosis" of "keratoconus of both eyes" and a "reason for visit" of "blurred vision." The "Progress Notes" describe Defendant's condition as follows:

> Advanced KCN OU
> Too advanced for CXL
> Pt is incarcerated and does not know when he will get out.
> Not a candidate for PK while incarcerated[4]

---

[4] KCN means keratoconus.  OU means "oculus uterque," or both eyes.  CXL means Corneal Cross-linking. PK means Penetrating Keratoplasty and is more commonly referred to as a corneal transplant.

> Could consider a scleral lens fit. I am not sure if this would be possible while incarcerated. Would need access to sterile saline and a mirror as well as a clean environment for lens storage and removal/replacement.

Defendant's motion to continue alleged that due to keratoconus, Defendant had "severe blurred vision which causes him to be unable to see clearly within three feet[,]" he could "only read documents when he places them within an inch of his eyes[,]" and the "broad effects of keratoconus make[ ] it extremely difficult for counsel to communicate with [Defendant] and for [Defendant] to comprehend legal issues in this case." Defendant contended that he "need[ed] surgery in order to correct his vision[,] [and] [h]e had previously been considered for surgery but he was apprehensive because it would require a cornea transplant and the surgeon would have cut his eye out and actually stitched the transplant cornea in its place." Defendant also asserted that, "[b]ased upon information and belief, the surgery [to correct keratoconus] is different now [than it was in 2021]." Finally, Defendant argued that he "cannot proceed to trial with blurred vision [that] would cause him to have difficulty seeing the court, witnesses, jurors and all exhibits that will be admitted into evidence."

The matter came on for trial 15 May 2023 in Superior Court, Mecklenburg County. The trial court first addressed Defendant's motion for a continuance filed

---

Pt means patient, referring to Defendant.

ten days earlier, with the State arguing that:

> [t]he last time this matter was presented to a [c]ourt was
> back in 2021 before the Honorable Judge Trosch. At that
> time[,] previous counsel made representations about
> accommodations being made, under the Americans [w]ith
> Disabilities Act, that they wished to proceed with that as
> opposed to [D]efendant choosing to have new surgery.
>
>  . . . .
>
> We've been preparing for this matter for months, and no
> issue regarding vision has been raised. [Defense counsel]
> did file the motion to continue based on visual
> impairment[,] [i]t would be the State's position that
> accommodations which we requested have been made and
> are currently set up in the courtroom, pointing one camera
> at the jury box, and what I would define as high-def 4K,
> and one at the witness box with a monitor in front of
> [D]efendant, allowing him to have that less than a few feet
> in front of his face to visually see them.

In response, Defense counsel argued that

> I'm not asking the [c]ourt to continue this matter forever.
> Certainly I'm not doing that, but I would tell the [c]ourt
> that [Defendant]'s condition of keratoconus . . . it's in both
> eyes, and he has blurred vision.
>
>  . . . .
>
> [A doctor] indicated in his report that [Defendant] doesn't
> know when he's going to get out, and he's not a candidate
> for [surgery] while . . . incarcerated.
>
>  . . . .
>
> [The doctor] said, I'm not sure if this would be possible
> while incarcerated. We'd need access to sterile saline and
> a mirror, as well as a clean environment for lens storage
> and removal/replacement. Your honor, I think that would

be appropriate to consider his evaluation for that lens. I would contend to you that certainly the accommodations [under the ADA] I would contend would not be sufficient.

The trial court denied Defendant's motion for a continuance, and the trial proceeded as scheduled. On 2 June 2023, Defendant was found guilty of first-degree murder and possession of a firearm by a felon. Pursuant to the guilty verdicts, Defendant was sentenced to life imprisonment without the possibility of parole for first-degree murder, and seventeen to thirty months imprisonment for possession of a firearm by a felon.[5] From this judgment, Defendant entered oral notice of appeal in open court.

## II.     Discussion

On appeal, Defendant contends that "the trial court denied [Defendant] his constitutional protections and erred by improperly relying on its own personal experience when failing to continue the trial." He also argues that his "conviction for possession of a firearm by a felon violates his rights."

## A.     Denial of Motion to Continue

In most cases, we review the trial court's denial of a motion to continue for abuse of discretion. *See State v. Smith*, 310 N.C. 108, 111, 310 S.E.2d 320, 323 (1984) ("A motion for a continuance is ordinarily addressed to the sound discretion of the trial court. Therefore, the ruling is not reversible on appeal absent an abuse of

---

[5] The State dismissed Defendant's indictment for robbery with a firearm.

discretion."). However, when "a motion to continue is based on a constitutional right, then the motion presents a question of law which is fully reviewable on appeal." *Id.* at 112, 310 S.E.2d at 323.

We first note that Defendant's motion to continue did state a constitutional basis for the motion. His motion to continue asserted that proceeding to trial with his blurred vision "would result in ineffective assistance of counsel and the denial of due process under the Fifth, Sixth, and Fourteenth Amendment to the United States Constitution." He requested that trial be continued "until after [Defendant] has surgery and his vision has improved." However, in his brief on appeal, in the "Statement of Standards of Review," Defendant argues that our standard of review for the trial court's ruling on the motion to continue is abuse of discretion. He does not substantively address a constitutional argument except to the extent he seeks to rely on cases addressing mental incapacity to stand trial.

Although Defendant's brief mentions his constitutional arguments, his brief does not address a *de novo* review of the trial court's ruling as a constitutional issue. Instead, his argument focuses mainly on the trial court's "findings of fact." He specifically argues that "the trial judge's denial of the motion to continue was a gross abuse of discretion." "The ruling on the continuance motion should have been based on the evidence presented and the interests of justice. Instead, the ruling was based, in large part, on the judge's own personal experiences." We therefore address the argument as Defendant has presented it and review for abuse of discretion.

Defendant argues that "the majority of the specific findings of fact denying [Defendant]'s request for a continuance were based upon the trial judge's own knowledge instead of the medical evidence presented." We first note that the trial court did not enter a written order denying the motion to continue and did not make "specific findings of fact." Although the trial court noted some facts in rendering the ruling on the motion to continue, Defendant has not identified any specific "fact" he contends was not supported by the evidence or is factually incorrect. Instead, his argument is that the trial court erred by relying on his own knowledge of keratoconus based on his own experience and medical treatment.

In the parts of the trial judge's comments Defendant discusses in his brief, the trial court notes his own knowledge of keratoconus. In fact, the trial judge informed counsel for Defendant and the State by an email *before trial* he suffered from the same condition as Defendant. Before hearing the motion to continue, the trial court noted:

> THE COURT: And before I hear from Mr. Butler, I have reviewed the defense's motion to continue. Just so y'all know where I come from, I read the motion to continue. I read the amendment to the motion to continue. I just reviewed the State's objection that was handed up, and most importantly, I've read Judge McKnight's order and recommendation. I also sent counsel an email on Friday. I trust everyone received that. Is that accurate?
>
> [DEFENSE COUNSEL]: Yes, Your Honor.
>
> [THE STATE]: Yes, Your Honor.

> THE COURT: I thought it was important to do that because I am in a fairly unique position as it relates to the issue in this case, and I think that -- in the interest of full disclosure, I think it's important to note, and in order to build a competent and relevant record, as I have the specific eye condition that [Defendant] has. I've had two surgical interventions for those, including two corneal transplants, so I'm certainly not going to substitute my own experience or my own expertise to the extent I have any, although I suspect there's not a single other judge in the state who's similarly situated to hear this particular issue. This literally is a luck of the draw, and I was not assigned to this case because of my background. I found out I was assigned to this case, and then subsequently found out about these issues, because to my knowledge no one in the courthouse knew this about me, but here we are. So I want to make it clear that while I have that experience, I won't substitute my own experience for evidence that's presented, any expertise and things of that nature. But "m also in a unique position in order to evaluate the assertions of the defense in terms of what [Defendant] can or cannot view, in terms of whether accommodations are or are not appropriate[.]

The trial court fully informed both Defendant and the State even before the trial date he had the same medical condition as Defendant. The trial court certainly had no obligation to divulge his own personal medical information to the parties in this public forum, but in an abundance of caution, the trial court made sure that both parties were aware of his unusual experience with the same condition. Defendant did not raise any objection to the trial court's participation in this trial, although he had full opportunity to do so.

In his comments during the hearing, the trial court demonstrated that he relied on the evidence presented, specifically Dr. Mathys's report. Defendant did not

present any additional evidence to assist the trial court in understanding Dr. Mathys's report, but thanks to his knowledge of the condition, the trial court could interpret Dr. Mathys's cryptic medical abbreviations. For example, the trial court noted:

> Well, let me just -- I just want to note a couple things real quick in the doctor's report. You know, first it says too advanced for CXL. For the uninitiated, CXL is corneal cross-linking. Corneal cross-linking is something that you use to prevent keratoconus from getting worse. It is not a treatment to make it better, typically. PK is penetrating keratoplasty, which is the fancy term for transplant. So I'm just noting those things, and of course, scleral lens. There are other contacts such as the hybrid lenses that I wear that aren't sclerals, but sclerals are typically for people that have really messed up pre-surgical corneas.

Defendant did not contend the trial court's interpretation of the report's abbreviations was incorrect, either to the trial court or on appeal. While Defendant is correct to observe that the trial court noted his own experience with keratoconus when considering the motion, that experience simply allowed the trial court to read Dr. Mathys's report without consulting a medical dictionary. Defendant makes no showing on appeal as to *how* the trial court judge's own experience with keratoconus affected his decision—let alone was the basis for—the denial of Defendant's motion. Moreover, Defendant makes no showing as to how the denial of the motion for a continuance prejudiced his ability to prepare his defense during the six years after his indictment—beyond the mere fact that Defendant could not see the proceedings

of his trial with perfect vision.[6]

Our Supreme Court has held that to establish a constitutional violation pursuant to a denial of a motion for a continuance, a criminal defendant must show he did not have enough time to adequately prepare a defense due to the denial of the motion. *State v. Harris,* 290 N.C. 681, 687, 228 S.E.2d 437, 440 (1976) (holding that the defendant "fail[ed] to show that he did not have ample time to confer with counsel and to investigate, prepare and present his defense" and thereby the trial court correctly denied the defendant's motion for a continuance). To demonstrate the amount of time to prepare a defense was *constitutionally* inadequate, the defendant must show "how his case would have been better prepared had the continuance been granted or that he was materially prejudiced by the denial of his motion." *State v. Covington*, 317 N.C. 127, 130, 343 S.E.2d 524, 526 (1986). Here, Defendant fails to carry this burden.

As the State astutely notes in its appellate brief, "Defendant's argument for a continuance was not based on an inability to prepare for trial, but Defendant's difficulty seeing items *at trial*." (Emphasis in original.) At the hearing on Defendant's motion for a continuance, his defense counsel argued that:

> It's really important to me, not only that, but for him to be
> able to write stuff down to let me know what he is thinking
> as the trial goes on, and help me evaluate the testimony.

---

[6] We note that Defendant's defense at trial, in no small part, relied on his argument that he was unable to see the victim. If anything, the trial court's accommodations to assist Defendant's vision at trial would only bolster the credibility of Defendant's testimony regarding his poor vision.

> Certainly, I've discussed the discovery with him, but I would tell the Court that discovery is certainly different than what is presented at every trial I've ever done. I know what the discovery says, but when it comes in to evidence, it's a whole different ballgame.

Because Defendant is contending that his ability to see *during* the trial was the basis for his need for continuance, Defendant seeks to rely on cases addressing a defendant's mental incapacity to stand trial. For example, he argues that "[t]his Court has considered whether a motion to continue should have been allowed . . . [so] a defendant's competency to stand trial could be evaluated," **[Defendant's Br. at 16]** citing to *State v. Robinson*, where this Court stated that "the evidence does not support the trial court's determination that [the] defendant was competent to proceed with trial at the time of his competency hearing" so "the trial court abused its discretion in denying defendant's motion to continue the proceedings until defendant" competency to stand trial could be evaluated and determined." 221 N.C. App. 509, 516, 729 S.E.2d 88, 95 (2012). Defendant argues that the trial court should have allowed "the continuance to see if any medical intervention could have improved the situation."

The State points out that Defendant's argument is misguided because the statutes and cases like *Robinson* that address incapacity to stand trial deal with a defendant's "mental illness or defect," not physical conditions such as vision. *See* N.C. Gen. Stat. § 15A-1001(a) (2023) ("No person may be tried, convicted, sentenced, or punished for a crime when *by reason of mental illness or defec*t he is unable to

understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner. This condition is hereinafter referred to as 'incapacity to proceed.'" (emphasis added)). Defendant has not cited, nor have we been able to find, any case that has applied the statutes or cases addressing mental "incapacity to proceed" to a defendant's physical condition, including vision. We agree with the State that *Robinson* and other cases addressing mental incapacity to stand trial are inapposite here.

As noted above, Defendant was diagnosed with a "degenerative eye condition of keratoconus," a physical condition that impacts an individual's ability to see. Defendant's keratoconus was a long-standing condition; based on his own testimony, he suffered from this condition since at least 2017 and his vision even then was so poor he could not see well enough to identify the unknown person whom he shot in the store. During the discussion of the motion to continue, Defendant's counsel acknowledged Defendant had been offered corrective surgery in 2021 to assist his vision. In 2021, the trial court had warned Defendant that if he did not pursue surgery punctually, he would not be allowed to assert his condition, and the need for surgery to alleviate the condition, as a basis for a continuance later—precisely what Defendant tried to do here, nearly three years after the warning in 2021.

At the hearing on the motion for a continuance, defense counsel asserted that the surgery available to Defendant in 2024 was *different* from the surgery available

in 2021. But Dr. Mathys's report provided no information about any different sort of procedure that may have been available to Defendant, and Defendant did not present any evidence of a different type of procedure or how the procedure had changed since 2021:

> [DEFENSE COUNSEL]: It's my understanding for [Defendant] is that he has some concern about the transplant surgery, but he has resolved that, and it's my understanding that there is a new method of that type of surgery.
>
> THE COURT: I'd love to hear about that myself.
>
> [DEFENSE COUNSEL]: Well, I reached out to [the doctor]. Haven't been able to talk to him yet. I started that effort as soon as I received the report, and left messages for him on Wednesday and Thursday, and I haven't heard from him.

Finally, "[w]hether [D]efendant [wa]s denied due process must be determined under the circumstances of [this] case[,]" *State v. McFadden*, 292 N.C. 609, 616, 234 S.E.2d 742, 747 (1977), and we note that the trial court made several accommodations to assist Defendant's vision during his defense, including providing two high-definition cameras pointed at the witness stand and the jury box that transmitted the picture to monitors a few feet in front of Defendant. The trial itself was held in a smaller courtroom, where "distances . . . were significantly less than they are in other courtrooms[,]" and the State also provided Defendant with a "nearfield monocular" which magnified documents up to six times, so that Defendant could see the documents presented. And on appeal, Defendant does not contend that the trial

court's accommodations of his visual impairment were insufficient, nor did Defendant request any accommodation during the trial that was not provided.

Therefore, after "review by examination of the particular circumstances as presented by the record[,]" *State v. Gardner*, 322 N.C. 591, 594, 369 S.E.2d 593, 596 (1988), we conclude that the trial court did not abuse its discretion in denying Defendant's motion for a continuance. Nor on *de novo* review of Defendant's claim to a constitutional right to a continuance, did it deprive Defendant of due process protections by denying his motion for continuance and allowing trial to proceed as scheduled, nearly six years after the offense charged, and nearly three years *after* Defendant had previously asserted his need for corrective surgery. Defendant has not demonstrated "how his case would have been better prepared had the continuance been granted or that he was materially prejudiced by the denial of his motion." *Covington*, 317 N.C. at 130, 343 S.E.2d at 526.

## B.  Felon in Possession of a Firearm

Next, Defendant argues that his "conviction for possession of a firearm by a felon violates his rights." First, we note that Defendant did not raise this constitutional claim before the trial court and concedes on appeal that "[n]o specific constitutional arguments were made for setting aside the possession by a felon conviction."

Our appellate rules require that, "to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion,

stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C.R. App. P. 10(a)(1). On this issue, our Supreme Court is clear, "constitutional matters that are not 'raised and passed upon' at trial will not be reviewed for the first time on appeal." *State v. Garcia*, 358 N.C. 382, 410, 597 S.E.2d 724, 745 (2004) (citation omitted). While Rule 2 of the North Carolina Rules of Appellate Procedure allows for suspension of preservation requirements in "exceptional circumstances[,]" *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 196, 657 S.E.2d 361, 364 (2008), Defendant does not demonstrate any exceptional circumstances justifying suspension of our appellate rules. Therefore, we dismiss Defendant's constitutional argument as unpreserved.

## III.  Conclusion

We conclude that the trial court did not abuse its discretion by denying Defendant's motion for a continuance and that Defendant's constitutional argument regarding possession by a felon is unpreserved. We conclude that Defendant received a fair trial, free from prejudicial error.

NO ERROR.

Judges ARROWOOD and FREEMAN concur.